## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

ERIC VINCENT,
*as the parent of B.V.,*

        Plaintiff,

    v.                               Case No. 10-C-0022

KENOSHA UNIFIED SCHOOL DISTRICT,

        Defendant.

KENOSHA UNIFIED SCHOOL DISTRICT,

        Plaintiff,

    v.                               Case No. 10-C-0049

B.V., by and through her Parents,
ERIC AND SARAH V.,

        Defendants.

### ORDER DENYING ERIC VINCENT'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART KENOSHA UNIFIED SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT, AND SETTING A STATUS CONFERENCE

In consolidated cross-appeals, Eric Vincent, the father of minor child BV, and Kenosha Unified School District ("KUSD") seek federal judicial review of the December 4, 2009, decision of the state administrative law judge employed by Wisconsin's Department of Public Instruction ("DPI"). Because of BV's disabilities, BV is protected by the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §1400 *et seq.,* and Wisconsin state special education law, Wis. Stat. Ch. 115. The ALJ found that, although BV's Individualized Education Plan ("IEP") was appropriate, KUSD deprived BV of a free appropriate public education ("FAPE") when it instructed BV to remain off campus

between September 30, 2008, and May 11, 2009, during its reevaluation of BV's behavioral problems. In addition, the ALJ found that KUSD's unilateral decision to extend the time to reevaluate BV was a procedural violation of state law not barred by equitable estoppel. Finally, the ALJ determined that BV was entitled to 24 hours of compensatory education time to make up for the education not provided between September 30, 2008, and January 10, 2009, and four hours for each school day between January 11, 2009, and May 11, 2009. The ALJ denied the motion for reconsideration. (Record, Order on Motion for Reconsideration.)

This court consolidated the two appeals filed by the parties pursuant to 20 U.S.C. § 1415 and 34 C.F.R. § 300.512. The consolidated cases come before this court on cross motions for summary judgment. Vincent believes that the ALJ made "fair legal conclusions to remedy" the injustice but maintains that two of the legal conclusions are not supported by the evidence in the record or the legal standards set forth in the IDEA. First, Vincent argues that the ALJ erred when he found that KUSD's initial IEP on September 10, 2008, was substantively appropriate under the requirements of the IDEA and its implementing regulations. Second, Vincent challenges the ALJ's calculation of how much compensatory education BV was entitled to as a remedy for KUSD's failure to provide FAPE.

KUSD does not appeal the finding that it committed two procedural errors. Instead, it appeals the compensatory education order. Specifically, KUSD challenges the ALJ's finding that the procedural violation caused substantive harm and that compensatory damages are available to remedy a purely procedural violation. In addition, KUSD asserts that there is no evidence in the record to support a finding of what compensatory education is appropriate or how much compensatory education is appropriate. For the reasons

2

below, the cross motions for summary judgment are denied in part, the ALJ's decision affirmed in part, and the court will conduct a status conference to discuss further proceedings consistent with this decision.

STATEMENT OF FACTS

The court finds no bases for the parties' vehement disagreement regarding their respective proposed findings of fact because summary judgment in the context of an IDEA case has a different meaning than it does in a Rule 56 case. Here, review is dictated by the unique standards of the IDEA, 20 U.S.C. § 1415(i)(2). On issues of law, the hearing officer is entitled to no deference. *Alex R., ex rel. Beth R. v. Forrestville Valley Community Unit School Dist. No. 221*, 375 F.3d 603, 612, (7th Cir. 2004.) The court receives and affords due weight to the ALJ's findings of fact. *Id.*

BV is a minor child, who previously lived in Alabama, and established residency in Kenosha Unified School District on July 31, 2008. (ALJ ¶ 1, KUSD Hrg. Ex. 101 at 9.) Since the second or third grade, BV has had increasing behavioral disruptions. (ALJ ¶¶ 2-3; Tr. at 15-18.) These behaviors include visual/auditory hallucinations, assaultive/biting behavior, and low frustration tolerance. (ALJ ¶ 11, KUSD Ex. 101 at 103.) She has been physically aggressive towards teachers, and has bitten herself. (ALJ ¶ 24, Tr. at 432.) Information presented to KUSD prior to her enrollment included that she bit, scratched, and banged her head. (KUSD Hrg. Ex. 101 at 286.)

In September 2005, a diagnosis indicated childhood schizophrenia. (ALJ ¶ 3.) In January 2006, potential diagnoses were posited, including schizophrenia and Psychotic Disorder NOS. (ALJ ¶ 4.) In June 2006, a diagnosis concluded Psychotic Disorder NOS and Communication Disorder NOS. (ALJ ¶ 7.) A September 2008 diagnosis indicated

3

Childhood Disintegrative Disorder, Disruptive Behavior Disorder NOS, but ruled out Psychotic Disorder NOS. (ALJ ¶ 15.[1]) A December 2008 diagnosis indicated Psychotic Disorder NOS, but ruled out Childhood Disintegrative Disorder and schizophrenia. (ALJ ¶ 15.[2]) Regardless of the diagnosis, there is no dispute that BV is disabled, and is prone to random aggressive tendencies including hitting and scratching those persons within her proximity as a manifestation of her disability.

From June 2006 through July 2008, BV resided for two years at Alabama's Laurel Oaks Behavioral Health Center pursuant to court order initiated by an Alabama child welfare agency. (ALJ ¶ 6, 8, Tr. at 19-20, 42.) While there, BV attended New Day Academy, but stayed on the grounds of Laurel Oaks "on most if not all school days" due to safety concerns. (ALJ ¶ 10, KUSD Hrg. Ex. at 120.)

The day after Laurel Oaks released BV into the custody of her parents, BV moved to Kenosha, Wisconsin. (ALJ ¶¶ 1, 12, Tr. at 21.) The transition from her residency at Laurel Oaks to her residency with her parents was marked by severe mood swings, bizarre behavior, and incidents where she became physically aggressive without apparent provocation or reason. (ALJ ¶ 13, Tr. at 47-48.) Soon after her arrival in Kenosha, BV had an episode that caused her parents to take her to the St. Catherine's emergency room voluntarily. (ALJ ¶ 13, Tr. at 22.) On the recommendation of the emergency room staff, BV's parents caused BV to be admitted to the Winnebago State Mental Health Institute until August 6, 2008. (ALJ ¶ 13.)

---

[1]Though the ALJ cites to the KUSD Hrg. Ex. 101, the pages to which he cites are missing from our record.

[2]Missing cites, see fn. 2.

4

On or about August 21, 2008, BV's parents contacted KUSD and stated their intent to enroll BV for the 2008-2009 academic year. (ALJ ¶ 14.) KUSD advised BV's parents on August 26, 2008, to visit the district offices to register BV. (ALJ ¶ 14.) Due to additional behavioral episodes, BV was hospitalized at Children's Hospital of Wisconsin from August 28 until September 2, 2008. (ALJ ¶ 15.[3])

KUSD convened the first IEP team meeting for BV on September 10, 2008, to develop an IEP for the 2008-2009 academic year. (ALJ ¶ 17.) In addition to KUSD personnel, BV's parents and two representatives from DCFS contractor Families First attended. (ALJ ¶ 16, 17.) The IEP team reviewed records from New Day Academy, including the IEP created by New Day Academy ("New Day IEP"). (ALJ ¶ 17, Tr. at 328, 359.) This IEP was not adopted by KUSD primarily because of the limited academic functioning information available to KUSD. (*Id*.) At least some of the IEP team considered the information to include assessments from BV's past that were inapplicable to her in September 2008. (Tr. at 359.) Indeed, her September IEP indicated that her "last IEP evaluation is past due and she needs a complete IEP evaluation to determine her academic and behavioral needs." (KUSD Hrg. Ex. 101 at 293.) The entirety of the September IEP's discussion of BV's academic functioning includes:

> [BV's] academic skills are unclear at this time. Laurel Oaks residential treatment facility (New Day Academy) reported that [BV's] performance in school was minimal due to behavioral issues. Parents report [BV] can read and write but it is unclear at what levels. Alabama's Alternate Assessment completed in Spring of 2008 reports Reading achievement did not meet standards, while [in] mathematics she met partical standards. In Science, [BV] met partical standards. Staff members at New Day Academy, believe [BV] has more academic skills and knowledge than she demonstrates.

---

[3]Missing underlying cites – see FN 2.

(KUSD Hrg. Ex. 101 at 184.)

The IEP team decided that BV needed to be re-evaluated to better understand her current needs. (KUSD Hrg. Ex. 101 at 185.[4]) In lieu of a more comprehensive IEP, the IEP developed on September 10, 2008, ("September IEP") focused on BV's behavioral problems. (ALJ ¶ 19, KUSD Hrg. Ex. 101 at 185.) There was only one annual goal: BV "will reduce acting out physically and/or verbally when given direction or during transition times to no more than 2 incidents per hour." (ALJ ¶ 19, KUSD Hrg. Ex. 101 at 287.) Recognizing that the behavior impaired BV's learning and the learning of others, the team included a positive behavior intervention, indicating that they would "keep work expectations short and manageable to avoid frustration. [They would also p]rovide reinforcement after completed expectation." (ALJ ¶ 20, KUSD Hrg. Ex. 101 at 287.) No behavioral plan was developed, but the IEP contemplated further behavioral observation and evaluation, indicating: "Other assessment to be developed after evaluation of her needs and observation." (ALJ ¶ 20, KUSD Hrg. Ex. 101 at 287.)

The IEP provided that BV was to receive education two days per week for one hour each day after school hours but in a "school setting." (ALJ ¶ 21, KUSD Hrg. Ex. 101 at 290.) Even though the services were to be provided in a school setting, the IEP indicated the nature of the services as "homebound" because they would be delivered after school hours when no other children were present. (ALJ ¶ 21; KUSD Hrg. Ex. 101 290.) The homebound instruction allowed BV to be supervised more closely as KUSD believed this was necessary in light of BV's perceived aggressive behaviors that presented safety

---

[4]Note that the IEPs appear multiple times in the 309 page single exhibit provided by KUSD at the hearing. Though page numbers may differ, they are the same documents.

concerns. (ALJ ¶ 18, Ex. 101, p. 293.) The IEP noted explicitly that a placement in a self-contained class had been considered and rejected because BV's aggressive behaviors presented safety concerns. (ALJ ¶ 21, KUSD Hrg. Ex. 101 at 293.) Despite private concerns, BV's parents consented to homebound instruction on September 16, 2008. (ALJ ¶ 18; KUSD Hrg. Ex. 101 at 159.)

The IEP expressed the view that the behavioral-focused IEP would allow BV to ease into a new environment after having been in a residential treatment facility for the prior two academic years. (ALJ ¶ 22, KUSD Hrg. Ex. 101 at 293, Tr. 85-86.) It contemplated that the IEP team would reconvene to develop additional annual goals and increase the amount of services. (ALJ ¶ 22; Tr. at 86, 329-330.) The consensus of the IEP team was that two hours of weekly special education was an appropriate level at which to begin providing services. (ALJ ¶ 22.) No member of the IEP team articulated an opposing view, although BV's parents held *privately* the opinions that the level of services was insufficient, and that the homebound environment was inappropriate. (ALJ ¶ 22.) The parents appear to have expressed these opinions to KUSD for the first time during litigation. (ALJ ¶ 18, KUSD Hrg. Ex. 101 at 159.)

Included in the IEP were speech and language therapy services of 30 minutes once a month to be provided in a school setting. (ALJ ¶ 21, KUSD Hrg. Ex. 101 at 290.) The IEP was scheduled to begin September 22, 2008. (ALJ ¶ 21, Ex. 101, p. 290.)

Those services commenced on September 22, 2008, as planned. (ALJ ¶ 23.) BV performed well on that day, and had no incident of aggressive behavior. (ALJ ¶ 23.) However, on September 29, 2008, KUSD provided services to BV again. (ALJ ¶ 24.) There was a behavioral episode during which BV was physically aggressive towards her

7

teacher and bit herself. (ALJ ¶ 24; T. 432.) BV's father and two KUSD staff members restrained her until she calmed down. (*Id*.) The episode lasted approximately 10 minutes. (ALJ ¶ 24.)

The teacher who had instructed BV on September 22 and 29 expressed his concerns to KUSD about continuing to provide services to BV because of safety concerns. (ALJ ¶ 25.) A KUSD administrator then contacted a second teacher, who expressed reluctance to serve BV. (ALJ ¶ 25.) KUSD stopped asking teachers, and informed BV's parents that KUSD was discontinuing services to BV. (ALJ ¶ 25; Tr. at 52.) No further services were rendered by KUSD to BV either in school or at home. (ALJ ¶ 25.) On October 13, 2008, KUSD requested by letter the consent of BV's mother to conduct a re-evaluation of BV. (ALJ ¶ 26; KUSD Hrg. Ex. 101 at 228.)

After September 2008, BV's parents pursued several options to finding her suitable education. These included a visit accompanied by KUSD staff to Hillcrest School, on the recommendation of KUSD. (ALJ ¶ 27.) Though Hillcrest is an alternative special education school, KUSD and BV's parents agreed that Hillcrest would not be an appropriate placement for BV. (ALJ ¶ 27; Tr. at 96.)

Children's Behavioral Health Services (CBHS) started in-home services for BV. (ALJ ¶ 28.) CBHS is a community based agency focusing on children with autism. (*Id.*) By November 2008, CBHS provided approximately forty hours of service every week, generally every business day that BV was at home. (ALJ ¶ 28; Tr. at 157.) The services focused on BV's behavioral, interactive, and communicative skill deficits. (*Id.*) CBHS therapists observed that BV experienced one behavioral episode a week through December 2008, occurring randomly or without provocation. (ALJ ¶ 29; Vincent Hrg. Ex.

8

5 at 3; Tr. at 192.)  BV's mother informed CBHS staff that BV experienced an additional 3-4 episodes each week when CBHS staff were not present.  (ALJ ¶ 29; Vincent Hrg. Ex. 5 at 3.)  From mid-January to May 2009, CBHS staff noticed a general decrease in behavioral episodes, with the exceptions of increases in early January and April. (ALJ ¶ 29; KUSD Hrg. Ex. 101 at 151, Vincent Hrg. Ex. 5 at 10, 13.)

On November 4, 2008, representatives of the Kenosha County DCFS ("KC DCFS") offered their assistance in filing a voluntary petition for child protective services, which could have resulted in BV being institutionalized outside the district.  (ALJ ¶ 30; KUSD Hrg. Ex. 101 at 148-9.)  BV's parents declined the offer in December 2008.  (ALJ ¶ 30; Tr. 260-261.)

On November 11, 2008, BV's mother provided written consent for KUSD to re-evaluate BV.  (ALJ ¶ 31; KUSD Hrg. Ex. 101 at 230.)  By mailing this notice, state statutes required that KUSD complete the evaluation within 60 days, i.e., January 10, 2009.  (ALJ ¶ 30; KUSD Hrg. Ex. 101 at 180.)

On November 14, 2008, BV's mother informed representatives of KC DCFS that BV was a candidate for a study at the National Institute of Health in Maryland.  (ALJ ¶ 32; KUSD Hrg. Ex. 101 at 149.)  BV's father also informed KUSD of the same, but noted that BV's acceptance was not a certainty and that she could return at any time.  (ALJ ¶ 32; Tr. at 296.)  Indeed, she did return after she was not accepted.  (ALJ ¶ 33; KUSD Hrg. Ex. 101 at 149.)  BV's parents notified KUSD staff of her return on the day she arrived, December 4, 2008.  (ALJ ¶ 33; KUSD Hrg. Ex. 101 at 149.)

9

On January 7, 2008, KUSD staff met with Families First and CBHS, and was advised of the status of services being provided to BV and her progress. (ALJ ¶ 34; KUSD Hrg. Ex. 101 at 149.) KUSD decided to proceed with BV's re-evaluation. (*Id.*)

On January 8, 2008, KUSD sent a letter to BV's parents stating that KUSD "had not been able to complete the evaluation due to the unavailability of [BV] for testing." (ALJ ¶ 35; KUSD Hrg. Ex. 101 at 233.) Additionally, KUSD wanted "to *begin* the assessment process" two days before the January 10 deadline passed, and informed BV's parents that KUSD "will be extending the original timeline for completion of the evaluation." (*Id.*)(emphasis added). The letter did not seek the consent of BV's parents, and BV's parents did not communicate consent or objection to the letter. (*Id.*) Though BV was unavailable at times, the record is devoid of any evidence that KUSD affirmatively attempted to schedule any evaluations with BV during the 60 day timeline. (*See, e.g.,* KUSD's Response to Due Process Hearing Complaint, KUSD Hrg. Ex. 101 at 144; *see also* Summary of Service Minutes Provided to [BV], KUSD Hrg. Ex. 101 at 153-158.)

KUSD began holding meetings to plan for the re-evaluation of BV, including a January 19 meeting with BV's parents and an internal January 27 meeting. (ALJ ¶ 36; KUSD Hrg. Ex. 101 at 149, 153.) Throughout the spring, CBHS therapists provided therapy and sporadic but increasing academic instruction in math, reading, and language. (ALJ ¶ 37.) KUSD staff conducted testing between February and March 2009 (ALJ ¶ 37), and also advised CBHS therapists on the use of particular academic materials starting in April 2009 though the materials had been provided in March 2009 (ALJ ¶ 37; Tr. 175; Ex 5, pp10-16; Tr. 176). Though a normal evaluation team consisted of around three to four people, this evaluation team consisted of seventeen to eighteen. (Tr. at 368.)

10

On March 3, 2009, BV presented as an outpatient to the Waisman Center in Madison, Wisconsin, for evaluation. (ALJ ¶ 38; KUSD Hrg. Ex. 101 at 150.) She had a follow-up appointment on April 7, 2009. (*Id.*) Though KUSD expected information to be provided to the district on April 8 (ALJ ¶ 38), the information provided to the parents as a result of this evaluation was never provided to KUSD. (ALJ ¶ 40; Tr. at 370-371.)

On April 13, 2009, BV presented to the Mayo Clinic in Minnesota for evaluation. (ALJ ¶ 39.) She was admitted on April 20, 2009, and released on May 8, 2009. (ALJ ¶ 39.) The information provided to the parents as a result of this evaluation was never provided to KUSD. (ALJ ¶ 40; Tr. 300-301.)

Initially, KUSD planned an IEP meeting for April 2, 2009, but rescheduled it to May 11, 2009. (ALJ ¶ 39.) The meeting included twelve KUSD staff, both parents, a parent-advocate, a Families First representative, and BV's senior therapist from CBHS. (ALJ ¶ 40, KUSD Hrg. Ex. 101 at 236, 249.) BV's parents did not provide the reports from the Waisman Center or the Mayo Clinic at this final hour because, according to the parents, the reports did not generate new, useful information. (ALJ ¶ 40; Tr. 300-301.)

The IEP developed on May 11, 2009, ("May IEP") contained twelve annual goals in nine subject areas. (ALJ ¶ 41, KUSD Hrg. Ex. 101 at 253-254.) It acclimated BV to the school, requiring for the first two days, two hours of instruction; three hours for the next three days; then four hours for every day thereafter. (ALJ ¶ 41; KUSD Hrg. Ex. 101 at 256.) Moreover, the IEP required BV to attend Lance Middle School. (ALJ ¶ 41, KUSD Hrg. Ex. 101 at 260.)

The IEP adopted positive behavior interventions with certain approaches and training of KUSD staff in recognition that BV's behavior impeded her learning and the

11

learning of others.  (ALJ ¶ 42, KUSD Hrg. Ex. 101 at 252.)  For example, the IEP required teachers to "keep work expectations short and manageable to reduce frustration" and to "provide reinforcement after completed expectation."  (ALJ ¶ 42, KUSD Hrg. Ex. 101 at 252.)  Additionally, staff working with BV were to "be trained in behavior management strategies to support [BV] when her behavior becomes aggressive to keep others from being injured."  (ALJ ¶ 42, KUSD Hrg. Ex. 101 at 252.)

Though the IEP indicated that a behavioral intervention plan ("BIP") was attached, the IEP team did not develop the BIP on May 11.  (ALJ ¶ 43, KUSD Hrg. Ex. 101 at 252.)  A meeting focused on developing further information regarding BV's behaviors and effective responses was held on May 13, 2009.  (ALJ ¶ 43; KUSD Hrg. Ex. 101 at 152, 156.) Additionally, on May 27, 2009, a KUSD staff member and BV's mother telephonically developed a functional behavioral assessment ("FBA") and a BIP.  (ALJ ¶ 44; Tr. 66-67.)  The KUSD staff member advised BV's mother that the FBA/BIP could be reviewed on June 2, 2009, when an IEP review meeting was scheduled.  (ALJ ¶ 44.)  The completed FBA and BIP were added to the IEP and mailed to BV's parents on May 29, 2009.  (ALJ ¶ 44; Ex 101, pp 281-283.)  The IEP was implemented on May 14, 2009, through the rest of the 2008-2009 school year.  (ALJ ¶ 45.)

The ALJ found the following: The September IEP was substantively appropriate. (Op. at 17.)  KUSD denied BV a FAPE from September 30, 2008, until May 13, 2009, by failing to provide any educational services.  (*Id.*)  KUSD's four month extension to complete the re-evaluation was a procedural violation that denied BV a FAPE by causing a deprivation of education benefits pursuant, in part, to Wis. Stat. § 115.80(5)(c).  (*Id.*) KUSD did not violate special education laws when it developed the FBA or BIP in May

12

2009. (*Id.*) BV's request for compensatory education is not barred by the doctrine of equitable estoppel. (*Id.*) Placement of BV in a private school for one academic year is not necessary to compensate BV for the denial of FAPE from September 20, 2009, until May 13, 2009. (*Id.*) BV is entitled to 24 hours of compensatory services for the denial of FAPE from September 30, 2009, until January 10, 2009. (*Id.*) Additionally, BV is entitled to compensatory services for each school day from January 11, 2009, until May 13, 2009. (*Id.*)

## CONCLUSIONS OF LAW

In reviewing the parties' cross motions, the court has combined and arranged the arguments of the parties in the following order: (1) whether the ALJ erred as a matter of law when he found that the IEP was substantively appropriate; (2) whether the ALJ erred as a matter of law when he found that BV suffered a substantive harm; (3) whether the ALJ erred as a matter of law when he found that Vincent was not equitably estopped from obtaining relief; and (4) whether the ALJ erred or abused his discretion when he calculated the compensatory award.

First, Vincent argues that the ALJ erred in finding that the September IEP was substantively appropriate. Specifically, the solitary behavioral goal, pursuant to which instruction was provided after other students had been dismissed from school, violates the IDEA because the September IEP did not provide a *de minimus* educational benefit to BV. Vincent notes that the IEP failed to address other subjects, assessments, and classroom instruction as required by the IDEA, including participation in the Wisconsin Alternative Assessment of Students with Disabilities, and the behavioral goal was so insufficient that it was met on the first day that BV attended school, September 22, 2008.

13

Whether an IEP is substantively appropriate is a question of fact. *Alex R.* at 615. An IEP is valid when it complies with the procedures set forth by the IDEA and is reasonably calculated to enable the child to receive educational benefits. *Id.* at 613. An IEP is reasonably calculated to enable the child to receive educational benefits where the IEP is likely to produce progress. *Id.* (internal citations omitted.) Pursuant to the IDEA, courts must permit local educators wide latitude in developing an appropriate IEP, and local educators may exercise their professional judgment. *Id.* (internal citations omitted.) Additionally, adopting First, Second, Third, Fourth, Ninth, and Tenth Circuit law, an IEP must "take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated."[5] *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir.1990). Finally, a motion for summary judgment will be denied where a party with the burden of presenting evidence fails to establish that the limited goals of the IEP could not provide an educational benefit to the child. *Hjortness ex rel. Hjortness v. Neenah Joint School Dist.* 507 F.3d 1060, 1065 (7th Cir. 2007). *Hjortness* instructs that the issue is not whether the IEP could have provided significantly more educational benefit, but whether the existing IEP did not provide a *de minimus* benefit. *Id.*

---

[5]*Roland M.* appears to be the case that created the "snapshot rule." The following cases in the courts of appeal reference *Roland M.*: *D.F. ex rel. N.F. v. Ramapo Cent. School Dist.*, 430 F.3d 595, 599 (2nd Cir. 2005); *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir.1993); *M.S. ex rel. Simchick v. Fairfax County School Bd.*, 553 F.3d 315, 326 (4th Cir. 2009); *Adams v. State of Oregon,* 195 F.3d 1141,1149 (9th Cir. 1999); *O'Toole By and Through O'Toole v. Olathe Dist. Schools Unified School Dist. No. 233*, 144 F.3d 692 (10th Cir. 1998). *Roland M.* or its progeny in other circuits has also been adopted by the Northern District of Indiana in *Roy and Anne A. v. Valparaiso Community Schools*, 951 F. Supp. 1370, (N.D. Ind. 1997) and by a judge in the Eastern District of Wisconsin in *Suzawith v. Green Bay Area School Dist.*, 132 F. Supp. 2d 718 (E.D. Wis. 2000). These cases have not been overturned.

14

The ALJ found that KUSD decided suitably that the New Day IEP provided insufficient information to develop an appropriate IEP for BV on September 10, 2008.[6] His finding of fact number 17 noted that the New Day IEP lacked information related to BV's current academic functioning. Indeed, the September IEP indicated that the IEP team was unclear as to the particular academic abilities of BV. Further, it recognized that the New Day IEP and information from Laurel Oaks did not provide the KUSD IEP team with data sufficient to create a comprehensive IEP. Admittedly, whether a student sat in a classroom on a particular number of days and was taught certain topics bear no indication of the student's retention, academic ability, or appropriate placement at any particular grade level.

As the ALJ reasoned, KUSD only had two weeks to gather information concerning BV prior to the IEP team meeting on September 10. (Op at 10.) The ALJ reviewed everything that KUSD was aware of during the September IEP meeting, including: (1) BV had not attended a public school for the previous two and a half years, but had been in a private residential treatment facility in Alabama (Op. at 11); (2) BV received scant educational services pursuant to the IEPs because of behavioral episodes (Op. at 11); (3) BV's behaviors caused injuries to herself and others (Op. at 11); and (4) since establishing residency in Wisconsin, BV had been admitted to two different hospitals.[7] (Op. at 11.) He relied heavily on the IEP team's conclusion that further evaluation was

---

[6]Perhaps Vincent asks the court to infer that attendance for 65% of the year and a graduation to the next grade level indicate a particular proficiency that is (a) standard at least between Alabama and Wisconsin or (b) concrete enough to develop an IEP. There are numerous problems with this possible logic, not least of which is that the court will not infer the very issue in dispute. Additionally, for an individual plan to account for particular subjects, KUSD needed particular information not provided by general grade levels and attendance records.

[7]She was actually admitted to two different hospitals for mental health concerns, and the St. Catherine's emergency room for physical injuries. The court assumes that the ALJ refers to Winnebago and Children's Hospital, but not St. Catherine's emergency room. In any case, correcting this problem does not favor Vincent's argument.

necessary to assess BV accurately, and that BV needed a "slow and well-thought out transition to a public school setting." *Id.*

Vincent does not suggest how the September IEP did not provide BV with a *de minimus* educational benefit. The limited snapshot of BV's academic functioning, the pressing need to acclimatize BV to her new environment to prevent class disruptions and physical injury, and the time limitations contemplated by the September IEP, all combine to show that the September IEP could have provided educational benefit to BV from September 2008 until January 2009 by teaching her to function within a school environment without disrupting her learning, or the learning of her future classmates. Rather than confront this educational benefit, Vincent argues only that KUSD's IEP could have provided more than trivial education to BV and was substantively inappropriate. This argument ignores the limited time in which the September IEP was supposed to be in effect.

Vincent also makes passing reference to the "single behavioral goal [that] was worded, '[B.V.] will reduce acting out physically and/or verbally when given direction or during transition times to no more than 2 incidents per hour.'" This contention ignores that the goal was designed generally to reduce significant behavioral issues that manifested on the second day that BV received educational services. Indeed, the passing mention of the actual requirement indicates that Vincent does not even find merit in the contention that reduction of BV's behavioral problems was a goal. Nevertheless, Vincent does not challenge any of the ALJ's findings of fact indicating that the September IEP attempted to decrease BV's behavioral problems.

16

Considering BV's violent tendencies, her new exposure to Wisconsin, her school, her parents, her teachers, and her therapists after a two year residency at Laurel Oaks in Alabama, Vincent has not established that the IEP could not provide BV a significant educational benefit by acclimatizing her to her new environment and new people during the fall of 2008. Certainly, if the September IEP had contemplated permanency, Vincent's arguments would have been more convincing because BV would have satisfied the goal at some point. However, as argued, Vincent does not confront the educational benefit that BV could have received had she been provided services pursuant to the September IEP.

The ALJ noted that limited IEPs, such as the September IEP, were rare, but concluded *on the facts* before him that the September IEP was reasonable. *Id.* Thus, Vincent has failed to convince the court that the ALJ's decision was in error by a preponderance of the evidence. Affording the ALJ's finding of fact due weight to which the decision is entitled, the decision is unassailable.

Next, KUSD maintains that the ALJ erred when he found that BV suffered a substantive harm. KUSD admits to two procedural failures: KUSD stopped providing BV with education two hours each week and did not reevaluate BV in a timely manner. However, KUSD submits that BV was not prepared to start school until May 14, relying primarily on the non-expert testimony of Families First supervisor Deb McGrain who interacted with BV and her parents. Moreover, KUSD argues that BV would not have attended school until May 14 even with a procedurally effective IEP. Although KUSD does not refer to its actions as a suspension of BV, in effect, it contends that BV's behavioral problems permitted it to suspend BV until she was prepared to return to school.

17

The IDEA provides that a free appropriate public education must be "available to *all* children with disabilities residing in the State between the ages of 3 and 21, inclusive, *including* children with disabilities who have been suspended or expelled from school." 20 U.S.C. § 1412(a)(1)(A)(emphasis added). Additionally, the IDEA requires the school district to work with the parents of the disabled child to determine "what is uniquely appropriate for every child" by preparing an IEP. *Id.*

Despite these entitlements, disabled children may be suspended for behaviors that are manifestations of the disability. Specifically, 20 U.S.C. § 1415 (2005) provides that school officials may consider *ordering* a change in placement of a child on a case-by-case basis. *Id.* at 1415(k)(1)(A). However, school administration may only *order* the removal a disabled child from their placement for a maximum of ten days. *Id.* at 1415(k)(1)(B). The school administration has those ten days to determine whether a behavior that caused the suspension is a manifestation of the disability. *Id.* at 1415(k)(1)(E). Where a behavior is determined to be a manifestation of the disability, the IEP team shall either (1) create a BIP and return the child to her placement, (2) modify a BIP and return the child to her placement, or (3) modify the placement of the child *with the consent of the parents*. *Id.* at 1415(k)(1)(F).

Even in severe cases, the disabled child must be returned to her placement. Indeed, where a disabled child brings a dangerous weapon on campus, knowingly uses or sells controlled substances on campus, or inflicts severe bodily injury on another while on campus, the school may suspend the disabled child for a *maximum* of 45 days. *Id.* at 1415(k)(1)(G). But even in these extreme circumstances, the IDEA contains "stay put"

18

provisions that require that the child stay in her placement pending appeal.  *Id.* at 1415(k)(4).

The ALJ wrote that a "special needs child who is not provided services in accordance with an IEP is, by definition, denied a FAPE."  (Op. at 13, citations omitted.) Though stated quite simply, the ALJ's reasoning was quite clear and without error.  In light of KUSD's arguments, this court elaborates the ALJ's simple argument under the authority of its *de novo* review.

KUSD's reliance on BV's preparation for school as a cause to discontinue educational services is misplaced.  KUSD never had the authority to order BV to stay off campus for more than ten days without developing a new IEP.  Even construing BV's violent behaviors in the most extreme light possible, she never caused severe bodily injury to another.[8]  Though it is unclear what KUSD believes BV needed to accomplish to prepare for return to school, that is immaterial; KUSD may not supercede the protections afforded in accordance with the U.S. Code or its regulations by referencing a student's "preparation" or lack thereof.  BV was entitled to be in school receiving a free appropriate public education despite her behavioral problems pursuant to her effective and substantively appropriate IEP.[9]  However, she was not in school after KUSD unilaterally informed her that she could not return.  The harm was not the unilateral nature of the notice or the unilateral nature of the time extension to develop a new IEP, but that BV was

---

[8]Even if she had caused severe bodily harm, KUSD suspended BV for more than 45 days.

[9]KUSD's argument only really makes sense if the September IEP was not valid.  Certainly, though, KUSD has argued at length that the September IEP was substantively appropriate.  Implicitly, KUSD also contends that the September IEP was valid.  Its not clear how KUSD argues that, on the one hand the valid IEP indicated that BV should be in school, but, on the other, BV was not prepared for school.

19

not in school when she should have been in school pursuant to the terms of a valid IEP and the protections of federal law. If KUSD could not provide the services as required by the IEP, then KUSD could suspend BV for a maximum of ten days to allow for the consensual development of a new IEP even if that meant placing BV at a more appropriate school. Though KUSD had wide discretion to place BV appropriately, the IDEA and a FAPE require that she *had* to be placed *somewhere*. Escaping the suspension rules of the IDEA by arguing an ambiguous preparation for school is not a loophole that this court is willing to create.

The ALJ reasoned that removing BV from school when an IEP indicated that she should be in school was a substantive harm. KUSD has failed to establish that this decision was in error. Indeed, the preponderance of evidence indicates that BV was denied a FAPE.

Next, KUSD contends that Vincent is equitably estopped from relief for failure to object to: (1) KUSD's notice that BV should not return to school after the incident on September 29; and (2) KUSD's notice that BV's re-evaluation would be extended. The doctrine of equitable estoppel bars actions or non-actions where a party induces reliance by another to the other's detriment. *Randy A.J. v. Norma I.J.*, 2004 WI 41, P26, 270 Wis. 2d 384, 677 N.W.2d 630. However, as educational law is governed by federal and state statutes, and the application of the doctrine to this case is problematic.

The United States Code mandates that states create due process hearing procedures for parents to appeal the decisions of local educational agencies involving either proposals or refusals to initiate or change the identification, evaluation, or educational placement of a disabled child, or the provision of a free appropriate public

20

education to a disabled child. 20 U.S.C. § 1415(b)(3). Notably, § 1415 mandates that proposals *or* refusals are independently sufficient to file a complaint. *Id.* While a refusal contemplates an existing dispute between the parents and school, a simple proposal by the school contemplates no prior action on behalf of the parents. *Id.* Additionally, § 1415 contains a comprehensive list of the requirements to file a complaint. 20 U.S.C. § 1415(b)(7), 20 U.S.C § 1415(c). Nowhere within § 1415 is a requirement that a complaint be based on a properly preserved objection by the parents; rather, § 1415 generally indicates that the due process hearing complaint *is* the objection.

In Wisconsin, statutes are interpreted strictly to accomplish their purpose. *Ervin v. City of Kenosha*, 159 Wis.2d 464, 475, 464 N.W.2d 654 (1991). Where the strictly interpreted purposes of statutes conflict with the common law, the legislative intent prevails. *Id.* Wis. Stat. § 115.80(1)(a)1 provides one year for parents to file due process claims with the DPI. *Id.* Complying with 20 U.S.C. § 1415, Wis. Stat. § 115.80(1)(a)1 provides in relevant part that the statute of limitations begins when an IEP is initiated or modified. *Id.* Additionally, § 115.80(2m) set forth procedures for school authorities to address complaints, as filed with the DPI, before a due process hearing is held. *Id.* Wis. Stat. § 115.80 repeats the indication of 20 U.S.C. § 1415: the complaint requesting a due process hearing *is* the objection. *Id.*

Nowhere within 20 U.S.C. § 1415 or Wis. Stat. § 115.80 has the court uncovered a basis for requiring parents to preserve an objection to an IEP. *Id.* Indeed, such a requirement imposes a legal sophistication on the parents that is implicitly discounted by the two statutes. *See, e.g.,* Wis. Stat. § 115.80(1)(e)(1)(ensuring that parents receive a

21

copy of the procedural safeguards available to them within 10 days of the state agency's receipt of a due process hearing request).

The ALJ reviewed this argument by KUSD and found that (1) a parent's failure to object to a school district's action does not deprive the child of the right to FAPE, citing to Third Circuit law, and (2) the parents' lawsuit is "objection enough." Op. at 17. This decision is reviewed *de novo*.

The purpose and legislative intent of Wis. Stat. § 115.90(1)(a)1 is to give parents one year to file due process claims with the DPI, even if they did not object previously. The application of equitable estoppel in this instance attempts to strip parents of their ability to file due process claims in direct contravention to Wisconsin statutory law. BV's parents filed their due process hearing with the DPI on June 10, 2009, less than one year after the September IEP. (Op. at 1.) This complied with Wis. Stat. § 115.80(1)(a)1. Put simply, the statutory law supplants common law doctrine. The ALJ did commit error by rejecting this argument.

The final issue is whether the ALJ's compensatory award was appropriate. Beginning with the assumption that the September IEP was substantively inappropriate, Vincent asserts that BV should be awarded compensatory education from September 30, 2008, until January 10, 2009, commensurate with a substantively appropriate IEP, and suggests a calculation based on the May IEP. Essentially, Vincent seeks to have the May IEP's model applied to the entire 2008-09 school year. However, having found that the September IEP was substantively appropriate, this argument is moot.

Turning to KUSD's arguments, the court considers whether (1) a compensatory award can remedy a procedural harm as a matter of law; (2) Vincent met his burden

22

establishing compensatory damages; and (3) the ALJ abused his discretion when he determined that "it was probable" that the proposed January IEP would have been substantively similar to the May IEP. Because the court found that BV suffered a substantive harm, KUSD's first contention is moot.

Under the IDEA, district courts "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(III). Awarding compensatory education "is a decision that rests in the sound discretion of the district court." *Brown v. Bartholomew Consol. School Corp.*, 442 F.3d 588, 598 (7th Cir. 2006). However, in the cases that discuss compensatory awards, the students are not apparently limited in the amount of time in school that they can handle pursuant to a valid IEP. *See generally, e.g., id.*, *Board of Educ. of Oak Park v. Nathan R., ex rel. Richard R.*, 199 F.3d 377 (7th Cir. 2000), and *Linda W. v. Indiana Dept. of Educ.*, 200 F.3d 504 (7th Cir. 1999). Here, it is not clear how the ALJ reasoned that a 1:1 ratio based upon the May IEP is an appropriate measure to determine what KUSD should have known about BV in January 2009.

KUSD may have used the same number of evaluators or the exact same evaluators in January as it did in May, but the evaluations would have been done on a different child. A FAPE in the fall of 2008 would have resulted in two hours of instruction per week. After November 2008, BV received extensive CBHS therapy of essentially 40 hours per week, including academic instruction beginning in February or March 2009. In total, BV received an additional four and a half months of this therapy by May 2009 than she would have received if the IEP meeting had convened in January 2009. Therefore, it is not clear if BV would have progressed as far by January 2009 as she did by May 2009. Additionally, it is unclear whether the IEP team would have had the same academic information in January

23

2009 as it did in May 2009 because BV's academic instruction began in February or March 2009.

What is clear is that BV is entitled to 24 hours of compensation for KUSD's violation of the September IEP by unilaterally suspending BV, as calculated by the ALJ from September 30, 2008, until January 10, 2009. Moreover, BV is entitled to educational compensation for the period from January 11, 2009, until May 14, 2009, as a result of KUSD's unilateral extension of time to reevaluate her in violation of the IDEA.

Questions remain regarding how BV should be compensated for deprivation of her FAPE during this period. Although the prospect of further delay is troublesome, the record is insufficient for this court to make the determination. Hence, the court will conduct a status conference to discuss further proceedings consistent with this decision.

IT IS ORDERED that Vincent's Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED that KUSD's Motion for Summary Judgment is denied in part.

IT IS FURTHER ORDERED that the parties appear for a status conference on October 9, 2012, at 10:00 a.m. in Courtroom 222.

Dated at Milwaukee, Wisconsin, this 26th day of September, 2012.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

24